IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


DIANA F. MENCHACA,

               Plaintiff,

    v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

               Defendant.

No. 6:15-cv-01470-HZ

OPINION & ORDER


Kathryn Tassinari
Brent Wells
Harder Wells Baron & Manning
474 Willamette St., Ste. 200
Eugene, OR 97401

      Attorneys for Plaintiff


//


1 - OPINION & ORDER

Billy J. Williams
United States Attorney, District of Oregon
Janice E. Hébert
Assistant United States Attorney
United States Attorney's Office
1000 S.W. Third Avenue, Ste. 600
Portland, OR 97201

Erin F. Highland
Social Security Administration
SSA Office of General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, WA 98104

      Attorneys for Defendant


HERNÁNDEZ, District Judge:

      Plaintiff Diana Menchaca brings this action under the Social Security Act ("Act"), 42

U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of the Commissioner of Social Security's

final decision denying her application for disability insurance benefits ("DIB") under Title II of

the Act and supplemental security income ("SSI") under Title XVI of the Act. For the reasons

stated, the Commissioner's decision is reversed and remanded for an immediate award of

benefits.

## BACKGROUND

      Menchaca applied for DIB and SSI in February of 2013, alleging an onset date of January

18, 2013. Tr. 24.[1] Her claim was denied initially and upon reconsideration. Tr. 24. Menchaca

appeared at a hearing before Administrative Law Judge ("ALJ") John Michaelsen in November

of 2014. Tr. 24. ALJ Michaelsen issued a decision on January 5, 2015, in which he found

---

[1] Citations to "Tr." refer to pages of the administrative record transcript, filed here as Docket No. 11.

Menchaca was not disabled. Tr. 24–33. Menchaca sought review by the Appeals Council, but was denied, making ALJ Michaelsen's opinion the Commissioner's final decision that Menchaca now challenges in this Court. Tr. 1–9.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). Each step is potentially dispositive. At step one, the presiding ALJ determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; if not, the analysis continues. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the ALJ determines whether the impairment meets or equals one of the impairments listed in the Social Security Administration ("SSA") regulations and deemed "so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis moves to step four. 20 C.F.R. §§ 404.1520(d), 416.920(d). At step four, the ALJ determines whether the claimant, despite any impairments, has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his or her past relevant work, the analysis moves to step five where the ALJ determines whether the claimant is able to do any other work in the national economy

considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f); Tackett v. Apfel, 180 F.3d 1094, 1098–1100 (9th Cir. 1999). If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g).

## ALJ DECISION

The ALJ found that Menchaca met the insurance status requirements of the Act through December 31, 2017. Tr. 26. At step one, the ALJ found Menchaca had not engaged in substantial gainful activity since her alleged onset day of January 18, 2013. Tr. 26. At step two, the ALJ found Menchaca had the following severe impairments: "posttraumatic stress disorder; [and] generalized anxiety disorder with major depression." Tr. 26. At step three, the ALJ found that Menchaca's impairments or combination of impairments did not meet or equal the severity of any listed impairments. Tr. 27–28. Next, the ALJ found that Menchaca had the following RFC: "[Menchaca] is capable of a full range of work except that she is limited to simple, repetitive, routine tasks with no more than occasional interaction with supervisors, coworkers, and the general public." Tr. 28. At step four, the ALJ found that Menchaca could not perform any past relevant work. Tr. 31. At step five, the ALJ found that through the date last insured, considering her age, education, work experience, and RFC, there were jobs in the national economy that

Menchaca could perform, such as cleaner II, transportation vehicles; inspector, hand packager; and laundry sorter. Tr. 32. Accordingly, the ALJ found that Menchaca was not disabled. Tr. 23.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the decision. Andrews, 53 F.3d at 1039–40. A reviewing court must consider the entire record as a whole and cannot affirm the Commissioner by simply isolating a specific quantum of supporting evidence. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) (citation omitted).

## DISCUSSION

Menchaca contends that the ALJ erred by (1) failing to give legally sufficient reasons for discounting the opinions of two treating mental health specialists; (2) failing to order a consultive psychological examination; (3) failing to give clear and convincing reasons for discounting Menchaca's testimony; (4) failing to properly consider lay evidence; and (5) failing to prove that Menchaca retained the ability to perform "other work" in the national economy. Pl. Brief at 1–2, ECF 15.

### 1.  Medical Evidence

Menchaca first argues that the ALJ erred in evaluating the opinions of Menchaca's treating mental health specialists. "Aside from one visit to . . . a family medicine specialist, Ms. Menchaca has receive[d] mental health treatment solely through South Lane Mental Health from providers who are nurse practitioners, licensed clinical social workers, or counselors." Pl. Brief at 10. These medical sources do not fall under the category of "acceptable medical source" to establish a medical impairment. See 20 C.F.R. § 404.1513(a)(1)–(5). However, the SSA may use evidence from other medical sources to show the severity of an impairment and how it affects a claimant's ability to work. 20 C.F.R. § 404.1513(d)(1). Opinions from these "other sources" are important and should be evaluated on key issues such as the severity and functional effects of a claimant's impairments, but they are not entitled to the same deference as opinions from accepted medical sources. Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012). Accordingly, the ALJ may discount an opinion from other sources by giving reasons germane to the opinion. Id.

The ALJ analyzed two opinions from Menchaca's treating mental health professionals. The first was a report from February of 2013, written by Jacque Tofflemire-DeBarmo, MS, LPC, QMHP, and Beth Henry, PMHNP. They wrote that Menchaca was "currently unable to work due to the severity of her symptoms," and they assessed her at a GAF score of 38.[2] In their report, they noted that Menchaca "appeared slightly anxious and at times it was difficult to track her disclosure and time lines. . . . [She] showed some insight . . . . Diana was appropriately dressed

---

[2] GAF scores are used by clinicians to rate an individual's overall level of functioning and can encompass psychological, social, and occupational abilities. Wright v. Comm'r of Soc. Sec., No. 1:13-CV-02193-ST, 2015 WL 462016, at *8 (D. Or. Feb. 4, 2015). Although the SSA has not adopted the GAF scale as directly correlative of an individual's ability to work, a GAF score provides a "rough estimate of an individual's psychological, social, and occupational functioning." Hall v. Astrue, No. CV 10-512-SI, 2011 WL 4381734, at *16 (D. Or. Sept. 19, 2011) (citation and quotation omitted). A GAF score of 38, indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM–IV at 34.

and groomed. . . . She was tearful at times, which was appropriate to verbal content at the time." Tr. 345. "Diana is requesting medication management and mental health therapy. . . . Prognosis appears good, based on her past functioning, to resume work when symptoms are managed with therapy and medication. She presents with a strong desire to return to work." Tr. 344.

The ALJ gave the opinion that Menchaca could not work and her GAF score "no weight as they were given during an initial intake when [Menchaca] was just beginning treatment." Tr. 31. The ALJ also rejected the opinion because "[s]ubsequent records did not show the level of severity implicated by such a low GAF score," and the "issue of whether [Menchaca] is able to work is one reserved to the Commissioner." Tr. 31.

Given the low bar required for the ALJ to reject the opinion of a non-acceptable source, the Court finds no error.

The ALJ properly discounted the opinion because it was based on a single visit with Menchaca. Hixson v. Colvin, No. 13-CV-05091-VEB, 2014 WL 3608899, at *8 (E.D. Wash. July 22, 2014) (This Court finds that the ALJ's assessment of these 'other source' opinions was supported by germane reasons," in part because the "opinion was rendered after only one visit"); Cleveland v. Astrue, No. CV09-4852SS, 2010 WL 1678294, at *9 (C.D. Cal. Apr. 23, 2010) ("The ALJ properly discounted the social worker's opinion because it was . . . based on only *one* meeting.") (emphasis in original) (internal citation omitted).

The ALJ properly disregarded the opinion that Menchaca was "currently unable to work" because the determination of whether a claimant is disabled is reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that you are disabled."). The opinion makes no attempt to explain how Menchaca's symptoms impair her functional capacity

and thus the ALJ was correct in noting that he did not have to consider it's conclusory statement about her ability to work. See Allen v. Astrue, No. 6:11-CV-06167-SI, 2012 WL 2921454, at *5 (D. Or. July 17, 2012) (finding that ALJ did not err in rejecting opinion that stated condition was "disabling" without discussing impact on claimant functional capacity) (citing Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001)).

The second opinion was a report from February of 2014, written by Elena Shore, LCSW, QMHP. Ms. Shore visited Menchaca at her home "due to [Menchaca's] inability to push past her anxiety and come into town for the session." Tr. 429. Menchaca said she rarely left the house, and her last trip to a store ended in a panic attack severe enough that she need assistance finishing her purchase and leaving the store. Tr. 429. Menchaca reported experiencing anxiety at an intensity of "8–10" throughout the day, every day. Tr. 429. She also endorsed a number of mental health issues like frequent panic attacks, feeling hopeless, social isolation, and paranoia. Tr. 429. She told Ms. Shore of her horrific childhood sexual and emotional abuse, and said she suffered from flashbacks of her trauma and nightmares. Tr. 430. Menchaca was restless, kept minimal eye contact and a mostly flat expression, and spoke in a pressured, scattered fashion. Tr. 431. Ms. Shore diagnosed PTSD and panic disorder with agoraphobia; she assigned Menchaca a GAF score of 38, and stated that she was "currently unable to work." Tr. 431.

The ALJ noted the GAF score of 38, but declined to adopt it as indicative of Menchaca's functioning: "While this score suggests an extremely limited level of functioning, [Menchaca's] activities, work history, and treatment record do not support this degree of debilitation." Tr. 31. Thus, the ALJ gave "no weight to this finding." Tr. 31.

None of these reasons is sufficient to reject Ms. Shore's opinion. First, the ALJ erred in relying on Menchaca's work history to discount Ms. Shore's finding. Menchaca's disabling

condition did not begin until January of 2013. Tr. 339. At that time, she was working as a customer service representative. She explained that negative interactions with customers had brought back memories of her past traumas, and she began to experience panic attacks and agoraphobia. Tr. 45. She took a temporary medical leave from work at that time, and hoped to return. Since then, however, her condition worsened, and she has been unable to work. Tr. 45, 345. In other words, her disabling condition caused her to stop working; it is not then a germane reason to cite Menchaca's work history as a reason for discounting the opinion of a medical provider attempting to treat her condition.

As for her activities, Menchaca stated that she rarely leaves her house, and spends most of her time on the computer because she is afraid to go outside. Tr. 236. She is able to do her own laundry, but she otherwise depends on her son to complete other household chores and to care for pets. Tr. 236, 238. She uses the computer to shop as much as possible so she can avoid going to stores. Tr. 238. She needs reminders to take her medication and to pay bills. Tr. 237, 239. She does not cook; she makes sandwiches or microwaves food. Tr. 237. Menchaca's reported activities are consistent with the level of severity reflected in Ms. Shore's report, and thus are not a germane reason to discount Ms. Shore's opinion.

Finally, the ALJ's unspecific reference to Menchaca's treatment notes is not a reason supported by substantial evidence in the record to discount Ms. Shore's opinion. Ms. Shore's 2014 report is entirely consistent with the 2013 Tofflemire-Darmo/Henry report. Both reports, almost exactly one year apart, assessed Menchaca with the same 38 GAF score. Both reports noted that she was unable to work because of severe anxiety and agoraphobia. Both reports noted her panic attacks, nightmares, and feelings of hopelessness and isolation. The ALJ is presumably relying on records from March of 2014, which the ALJ relied on in a previous section to show

Menchaca was cooperative with an examiner, made "fair" eye contact, and had a more moderate GAF score of 55 to 60. Tr. 30, 426. But one week prior, treatment notes reflect that Menchaca was "highly anxious and tearful throughout her appointment," and she reported "frequent panic attacks" that prevent her from going to stores, and that she "often feels too depressed to get out of bed." Tr. 427. Such "[c]ycles of improvement and debilitating symptoms are a common occurrence" in treating mental health issues, and thus the ALJ erred by "pick[ing] out a few isolated instances of improvement over a period of months or years and . . . treat[ing] them as a basis for concluding a claimant is capable of working." Garrison v. Colvin, 759 F.3d 995, 1017 (9th Cir. 2014).

### 2.  Credibility

Menchaca argues that the ALJ erred in discrediting her testimony. Pl. Brief at 17. An ALJ analyzes the credibility of a claimant's testimony regarding his subjective pain and other symptoms in two steps. Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (citation and internal quotation omitted). "The claimant, however, need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (citation and internal quotation omitted). Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject her testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so. Id. (citation and internal quotation omitted). The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work

record, and observations of physicians and third parties with personal knowledge of the

claimant's functional limitations. Smolen v. Chater, 80 F.3d 1273, 1283 (9th Cir. 1996). The

ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing

inconsistent statements by the claimant. Id.

The ALJ summarized Menchaca's testimony:

At the hearing, [Menchaca] testified that when she last worked she was yelled at a
lot, which she said triggered memories of abuse she had as a child. [Menchaca]
testified that since then she has had trouble getting out of her home. She said that
when she wants to go somewhere she begins panicking. She said that sometimes
rather than going out she ends up in a closet hiding or under covers hiding.
[Menchaca] further testified that she is afraid someone is watching her and that
she becomes very afraid. [Menchaca] noted that mental health therapy has helped,
but that she sometimes is unable to leave her home to attend appointments.
Additionally, the claimant noted that her son does most of the housework and that
she sometimes sleeps all day. She said that she might drive once a week for less
than a mile to a small store and that sometimes she does not even do that,
indicating her preference to send her son for groceries. She explained that she has
a lot of flashbacks from her past abuse. She said that she no longer attends church.
She said that most of the time she just sits in the house or sleeps all day.
[Menchaca] testified that her condition has worsened since her alleged onset date,
noting that she socializes less with others, including with her family online.

Tr. 29.

At step one, the ALJ found that Menchaca's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms." Tr. 29. The ALJ found at step two,

however, that Menchaca's statements about the intensity, persistence, and limiting of effects of

her symptoms were not entirely credible. Tr. 29. The ALJ noted that Menchaca's "receipt of

unemployment benefits raises a significant credibility concern." Tr. 29. The ALJ also discounted

Menchaca's credibility because her treatment records were not consistent with her testimony. Tr.

30. The ALJ also noted that Menchaca's "activities . . . strongly suggest that despite mental

symptoms she remained capable of some degree of simple, routine, repetitive work." Tr. 30. Tr. 30. Finally, the ALJ noted that some of Menchaca's "signs appeared to be situational." Tr. 30.

### a. Unemployment Benefits

"The receipt of unemployment benefits in Oregon is not necessarily inconsistent with the filing of an application for disability benefits under the Social Security Act." Hardin v. Colvin, No. 6:14-CV-01044-SB, 2015 WL 7766080, at *7 (D. Or. Nov. 4, 2015) report and recommendation adopted, No. 6:14-CV-1044-SB, 2015 WL 7777889 (D. Or. Dec. 2, 2015) (citing Mulanax, 293 F. App'x at 523). "Generally, in order to be eligible for disability benefits under the Social Security Act, the person must be unable to sustain full-time work-eight hours per day, five days per week." Mulanax, 293 F. App'x at 523. Under Oregon law, however, "a person is eligible for unemployment benefits if she is available for some work, including temporary or part time opportunities." Id. (citing Or. Admin. R. 471–0300036(2)(b), (3)(b)). Here, the record does not indicate whether Menchaca was applying for part-time or full-time work, and thus the ALJ erred in discounting her credibility because she applied for and received unemployment benefits.

### b. Treatment Records

The ALJ discounted Menchaca's credibility because her treatment records did "not fully corroborate" her claims about the severity of her symptoms, and did not support her claims that her conditions had worsened over time. Tr. 30. The ALJ found that "[a]lthough [Menchaca] testified that symptoms have worsened overtime (sic) and that her activity level accordingly waned, overall treatment records did not show significant signs of worsening." Id.

But a review of Menchaca's treatment records does not support the ALJ's reasoning. First, as set out above, Menchaca testified that her severe anxiety and PTSD make it difficult for

her to leave the house and that while mental health treatment has helped, she has difficult attending her appointments because of her anxiety and agoraphobia. Her treatment records corroborate this testimony. Menchaca reported to her treatment providers that she had difficulty leaving the house to attend appointments, even though she desired counseling to help her symptoms, and she habitually cancelled her appointments at the last minute or was a no-call, no-show. Tr. 350–51; 416–21. In February of 2013, she cancelled her first follow-up appointment at the last minute "due to high anxiety and a fear of leaving the house." Tr. 353. In 2014, she had a mental health intake appointment completed at her home because she was unable to "push past her anxiety and come into town for the session." Tr. 429. She reported that she "seldom leaves her home except to visit her boyfriend" and the "last time she went to Wal-Mart[,] she had a panic attack and needed assistance to finish her purchase and calm down enough to leave the store." Tr. 429. And shortly thereafter, she missed or cancelled numerous appointments. Tr. 416–21. She subsequently called her provider and apologized for her absences, explaining that "due to her depressed mood and anxiety, she has been having a difficult time leaving the house and wondered if she could have a phone session sometime." Tr. 416. All of this is consistent with her testimony that her anxiety and agoraphobia often prevent her from leaving her house.

Moreover, her treatment records support her claim that her condition has worsened over time. In 2013, she told her doctors that she had some anxiety and PTSD issues in 2003, but they resolved with medication and treatment; in 2013, both her "anxiety & depression were worsening." Tr. 352. In February of 2013, Menchaca was able to attend an in-person mental health intake evaluation; one year later, treatment providers performed another mental health intake at her home because she was "unable to come to multiple intake appointments at the agency due to anxiety . . . . " Tr. 431. In July of 2014, Menchaca reported lying in bed for days

because she "[didn't] feel emotionally well," and she reported "passive death wishes." Tr. 435. She told providers that she experienced anxiety "[e]very day, throughout the day" and with an "8–10" intensity, and that such attacks had happened since 2003 but had gotten "worse over the last year." Tr. 429. Again, this is entirely consistent with her testimony at the hearing in November of 2014 that her symptoms had worsened over time.

Finally, the ALJ pointed to Menchaca's apparent ability to interact with treatment providers as evidence that she was not as limited as she claimed. Tr. 30. That too is not a legitimate reason for discounting her credibility. Menchaca should not be punished for being open and honest with treatment providers about her horrifically abusive childhood or her recent decline in functioning in an attempt to receive mental health treatment. And secondly, as previously explained, Menchaca regularly cancelled appointments at the last minute or was a no-call, no-show, absences she later told her providers were due to her anxiety and agoraphobia.

In sum, the ALJ's reasoning that Menchaca's treatment records conflicted with her testimony is not supported by substantial evidence in the record, and thus is not a clear and convincing reason for discounting her credibility.

### c.  Daily Activities

Next, the ALJ discounted Menchaca's credibility because her daily activities "strongly suggest that despite mental symptoms she remained capable of some degree of simple, routine, repetitive work." Tr. 30. "For example," the ALJ continued, Menchaca "previously reported that she sometimes spent half the day using a computer and that she regularly used the computer to shop." Tr. 30. She also "indicated that she had no problem attending to personal care[,] that she prepared simple meals daily. . . .  that she did laundry weekly and that she drove a car." Tr. 30.

There are two separate ways an ALJ can rely on evidence of a claimant's daily activities to evaluate the credibility of her claimed limitations. One is if the claimant "engages in numerous daily activities involving skills that [are] transferrable to the workplace." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (citations omitted). The other is when a claimant engages in daily activities that are inconsistent with the severity of symptoms alleged. Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014). Here, the ALJ reasoned that Menchaca's daily activities suggested she was capable of performing some work; the Court disagrees. On its fact, the ALJ's description of Menchaca's activities is quite limited, and does not suggest a constellation of skills transferrable to the work place. Upon closer examination, the ALJ's reasoning is even more specious. For instance, Menchaca did indicate that she prepares meals daily, but on the same form stated that she does not cook, and the extent of her meal preparation includes making sandwiches and microwaving frozen dinners. Tr. 237. And while Menchaca stated that she shopped on the computer, she explained that she does so "as much as possible for all my needs" because her anxiety makes it very difficult for her to leave her house, much less go to the store. Tr. 238. Furthermore, Menchaca indicated that she does her own laundry, but again, she further explained that she relies on her son to perform all other household chores. Tr. 238. These activities do not suggest that Menchaca could maintain a full-time job, and accordingly, the Court finds the ALJ erred in relying on them to discount her credibility.

### d. Situational Stressors

Finally, the ALJ discounted Menchaca's credibility because some of her "signs appeared to be situational." Tr. 30. "For example," the ALJ wrote, "during the course of treatment in July 2014, [Menchaca] was noted to be quite anxious and tearful throughout the session. However, at that time, [Menchaca] reported that her boyfriend of 4 years just broke up with her." Tr. 30.

Additionally, in June of that year, Menchaca called to apologize for missing a therapy appointment because her grandfather passed away, and she was having difficulty leaving the house because she was depressed. Tr. 416. The ALJ's reliance on this evidence to conclude that Menchaca's symptoms were sometimes caused by situational stressors is a reasonable interpretation of the record, and thus the Court finds it a legitimate reason to discount her credibility. Karout v. Astrue, No. 3:12-CV-00643-AA, 2013 WL 1946222, at *5 (D. Or. May 6, 2013) ("This court may not question the ALJ's interpretation of the evidence, so long as the interpretation is supported by inferences reasonably drawn from the record.") (citing Batson v. Comm'r, 359 F.3d 1190, 1193 (9th Cir. 2004)). However, this reason standing alone is not sufficiently "clear and convincing" to uphold the ALJ's overall credibility finding in light of the ALJ's other errors in evaluating Menchaca's credibility.

Because the Court finds the ALJ erred in analyzing Menchaca's credibility and one treating source, the Court does not reach Menchaca's other asserted grounds for reversing the ALJ's decision.

### 3.  Remand

Having established that the ALJ committed legal error in discounting Menchaca's testimony and in rejecting the opinion of Ms. Shore, the final question is whether to remand for additional proceedings or an award of benefits. See, e.g., Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded," but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted).

The Ninth Circuit applies a three-part test to determine which type of remand is appropriate. Id. at 1020. First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. Each part must be satisfied to remand an award for benefits. Id.

Here, the ALJ failed to provide legally sufficient reasons for rejecting Menchaca's testimony and Ms. Shore's opinion. Menchaca testified that her anxiety and agoraphobia prevent her from leaving her house most days, and when she does leave, that she often suffers debilitating panic attacks. Her medical records show numerous cancellations and no-call, no-shows, which Menchaca attributed to her anxiety and agoraphobia. The VE testified that an employee with more than one unexcused or unscheduled absence per month would be terminated. Tr. 65. Given Menchaca's poor ability to maintain regular attendance, much less leave her house with any regularity, it is clear that Menchaca is not capable of sustaining competitive employment. Therefore, the record is fully developed, and if the case were remanded and the improperly rejected or discounted evidence is credited as true, the ALJ would be required to find Menchaca disabled under the Act. Allen v. Colvin, No. 03:12-CV-01544-ST, 2013 WL 6002363, at *16 (D. Or. Nov. 12, 2013) (crediting claimant's testimony as true and finding that her problems keeping appointments and traveling alone in unfamiliar place precluded her from performing any competitive employment, and remanding for benefits).

//

//

//

## CONCLUSION

The Commissioner's decision is reversed and remanded for an immediate award of benefits.


IT IS SO ORDERED.


Dated this _____ day of _____, 2016.

MARCO A. HERNÁNDEZ
United States District Judge